Lake Eugenia Land and Development v. BP v. Kevin Smith, and so on and so on. Mr. Rice, we'll hear from you first. Thank you for your police support. My name is Joe Rice, and I'm here today on behalf of three individuals that filed claims under a settlement agreement that I spent over a year negotiating. BP says in their brief on several places that I was the lead negotiator in this settlement. While I had many colleagues participate, I was one of the lead negotiators in the BEL and the IEL frameworks, which are both before the court today in this argument. This settlement agreement has been recognized by the district court and this court on numerous occasions, have arisen out of complex, long, drawn-out negotiations between sophisticated parties that had multiple issues to deal with. And we reached an agreement that was jointly presented to the court in an 1,100-page contract, a settlement agreement that was approved by the district court and ultimately by this court. Under that settlement agreement, the administrator was given limited authority, and his authority was to implement the terms of the settlement agreement. And that was contained in Section 4.3.10 of the settlement agreement itself. So the question that's presented before the court today is were these three individual class members who were seeking to recover only Wage 2 economic losses as individuals properly denied recovery because they were also an owner or officer of a business that filed a separate independent claim? The first thing I would ask is whether they had a loss. And I don't see that they had a loss. And the second thing, I don't see they had a loss that was caused by the BP spill. They had a loss as a result of their own willful conduct, as I see it. Now, you can explain to me why this is not. They chose not to accept the W-2 forms, form of payment, and instead they decided to opt out of that so they could come in and double dip. And that's the way it appears to me, and you tell me why I'm wrong. Well, Your Honor, they filed a claim to accept their W-2 wage losses, and the claims administrator's office applying Exhibit A determined that they did meet causation under the terms of the settlement agreement and that they had an economic loss. In other words, the settlement agreement requires a loss, an economic loss. Yes, sir. Where is their economic loss if they were paid as officers of the company and then they turn around and want to get essentially the same money that they've already been paid for? Where's the loss? They didn't have a loss. It wasn't the same money, Your Honor. And there's two separate claims here. The business filed a claim for its lost variable profit. These individuals had W-2 wages. They paid income tax on them. Now, W-2 wages provided as a set cost in the business economic loss plan. No, sir. I do not believe it was. Was it or was it not? It was not in my view. I thought that was part of the fixed cost. I mean, that's why you have this calculation of, well, it was treated differently, but there is some offset even you acknowledge for how it was treated in the business claim. In the business economic model, the framework, we spent a substantial amount of time looking at costs, both variable and fixed, and tried to establish as part of a negotiated resolution that we would, for efficiency's sake and to prevent subjective determinations, we agreed to how certain costs would be treated in a business claim for variable profit. Including owners, how much owners are being paid. Owners and officers' compensation was considered to be a fixed cost, whereas other salaries were considered to be, had a different methodology. And your people are owners and officers of the corporation. That is correct, but they receive compensation from the corporation in two different ways. And under the exhibit for individual economic loss, we expressly negotiated and expressly agreed that if you had a W-2 wage loss, unless you . . . I mean, I understand that language, but it says a W-2 wage loss. They didn't have a loss. They did under the terms of the contract, Your Honor. Yeah, but this is just, I mean, to me, I mean, you pardon me if you . . . But, I mean, there's overtones of a sham about this to me. As I understand it, now maybe I'm misreading the briefs and misunderstanding the case. But, I mean, you're trying to double dip for wages, for money that you've already got as a result of the BP spill, and now you claim a loss that's not a loss because you've already been paid that same money. I still understand where the straightforwardness is about this kind of interpretation of the agreement, frankly. I mean, look, go ahead. Can you put some numbers on it? That might help us understand if it's the same dollars or different dollars. It's different dollars. Can you put some numbers on it to address this concern? Okay. When you use the individual economic loss framework, you are allowed to take 90 days or more of your wages in the pre-spill period of time and compare it to the same period of time in the post-spill. In the situation here, when you do that math, under the mathematical calculations contained in Exhibit A for the economic loss claims, the accountants for the sum agreement determined that Mr. Fleischman had a $235,000 loss, Mr. Smith had a $220,000 loss, and Mr. Kelly had a $253,000 loss. Now, we— To address Judge Jolly's point, did they sort of make that up on the officer compensation? In other words, if they'd normally been paid $50,000 as officers and they're now being paid $300,000 as officers, that makes up for this loss of $250,000. Their income tax returns historically showed they had two methods of compensation from the business. One was owner and officer, which was reported on 1040 Exhibit C and D. There is no claim for that loss here. We did not file that claim because the— I think we're—and maybe I'm misunderstanding Judge Jolly's question, but I have the question of were they sort of subterfugally being paid more as officers and directors after the spill? There is no evidence of that. Or were that nets out against the loss of the W-2? There is no evidence of that in this record whatsoever. Well, but that doesn't answer the question. To the best of my knowledge, Your Honor, the business recovered a claim for its lost bearable profit. That did occur. But that included its fixed-cost officer and owner compensation. So why is this big discrepancy? Because you're admitting they get some of it back as an offset under your theory, but why did the calculations result in such a big gap? We actually put into the record the facts to support that if you had not treated the officer and owner's compensation as fixed cost, there would have been a difference, but the difference for Mr. Fleischman was $33,000. And I'm sorry, but why wouldn't it have fully—why wouldn't the business loss have fully included this $200,000 they were— Because historically they had taken out of the business by W-2 wages the profits of the business and not by owners and operators. So when they submitted their business loss, they could not put into the business loss what they had taken out as W-2 loss. The business didn't have that because the business dealt with bearable profit. So the only way these individuals had to look at the compensation they had historically taken out of the business by W-2 loss or W-2 income was to file a W-2 claim. And this is—I can give you a simple example how this works. Okay, let's assume, Judge, that my father and I owned a restaurant and my father—and a catering business. And my father dies, and he leaves his share of the ownership to my two children. We continue to run that restaurant. My son operates the catering business and is the salesman. He gets paid a commission for sales. That's his W-2. My daughter tends a bar and is a waitress at the restaurant. She gets a salary, but she also gets tipped. That's her separate— Why are we going to complicate it like that? Tell us about this case. Your Honor, I'm pointing out why there is a difference between the business's lost profit claim and the wage W-2 claim. Let me see if I can get straight on this. These claimants here were customarily paid and filed W-2—in a W-2 form, right? Before—customarily they got their income from W-2. One source. One source. All right, so then—and they are owners, and that's part of the fixed costs of the operation of the business. The business gets those W-2—the compensation that they would get under W-2 forms. And they say, no, we're not going to take it in the W-2. We're going to leave that over here so we can go over here and claim that we didn't get any money. The business did not get their W-2 forms. That's the fallacy. I know. They got the money that would have gone to the W-2 to pay them. The settlement agreement paid them the money that they ordinarily would have paid for the— Not under the terms of the business economic loss. The expense was treated as fixed expense. Yeah, but these are weasel words. The record shows that the difference that the business would or would not have gotten is less than $100,000. We're not talking about double recovery. That's another issue, really. I mean, as far as I'm—in other words, I'm not saying they got identically the same amount. I don't know that, one way or the other, whether they got identically the same amount or they might have gotten more if they'd been paid a little differently. But that's double whether they got—and then you may have an argument that there's no double recovery because they got paid a little less this way than this way. That's double recovery. But I'm not talking about double recovery. I'm talking about whether they even qualified under the BEL and the LEL for compensation from both of them. And I'm just saying that they're double— There is no dispute that these individuals were class members. There's no dispute that under the definition of individuals in Section 3884 that they were natural persons to seek their recovery under W-2 wages. But there is no loss unless it's minuscule. Your Honor, I submit that there is a loss because they got in compensation. Compared to the pre-spill and post-spill, they received substantially less money. Go ahead. But then the question is, are they getting it in the back door? And maybe that's the double recovery, although I think double recovery is a different arena. But are they getting it in the back door as owners what they otherwise would have gotten as W-2? And the net-net is basically that they are made whole already. No, because the revenue calculation and the variable profit calculation and the business economic loss focuses on variable profit of the business. Okay. And that's what they recovered. They did not recover the W-2. With a simpler analogy be I'm a shareholder in a company I also work for, and I recover value in my shares, but I also recover for money that I was out, not being able to work for my business for the three months it was closed because of the spill. You would have a W-2 loss for your salary you did not get, and you would have a loss on the company for the variable profit if the variable profit of the company went down. And you would report those. Is that the analogy here? Yes, because these individuals had historically 1040 income, and that was expressly excluded and negotiated to be specifically treated differently in the settlement. But the terms of the settlement agreement, which are the binding document here, is that these individuals as class members that suffered a W-2 wage loss were given a right under Exhibit 8 to recover mathematically calculated damages if they exist, and under the record here they were found to exist, and then they were excluded. Why did they decide to go the W-2 route? They had no option. The settlement agreement only gives them the right to file as individuals for W-2 losses. There is no other way for them to go. They had the right. Why did they decide to forego what I mean to say? Why did they decide to forego the usual method of payment in that architectural firm? They did not, Your Honor. They followed the exact same method of payment. The pattern that they had always followed? Yes, sir. Their tax returns that are in the record and the accountants' worksheets show that they had monthly income that they took as wages from 2007, 2008, and 2009, and they compared that for the 90 days, actually here they used a nine-month period, to the post-bill era for the same months, and they found they got substantially less revenue or wages because the company had less money. So they recovered under the mathematical formula what the document gives them. I mean, if you say that there's no double recovery, as I say, that's another argument. But if they, as I understand the briefs and the record, and you obviously know a whole lot more about this case than I do, my having just read the briefs, but, I mean, from my point of view, as I understand, they opted this time not to go W-2, and so they could say we had this loss, this year we're not paid, we can fall under the technical language of this LEL. I mean, or under the BL and the LEL. They get recovery from both of them. Actually, Your Honor, that would be an impossible factual scenario, and the reason being is they did not have any knowledge of this settlement until 2012. So they would have had no knowledge of what choice to make. This settlement was not presented to the court until 2012, and these damage calculations are what happened in 2010. So they had already, the facts had already developed and been existent before they knew the formula to apply. So they could not have made an election of what to do in 2010 because of this settlement. Now, what this settlement did is say you take pre-spill compared to post-spill, and if you have a loss calculated by a comparison of your earnings pre-spill to the spill period, you're entitled to recover that, and they showed unequivocally that they had that loss, and there's no argument below. The brief said they opted to forego the W-2. Your Honor, that's an error. There's no place that they had an option. What I believe the brief said is they said that I, as the negotiator, had the option to have treated fixed expenses for owners and officers as a variable expense. My obligation as a negotiator, and we treated each of these categories separately and independent of one another, is we negotiated a remedy for business economic losses, and we negotiated in Exhibit 4D a large number of expenses, and for efficiency's sake and for purposes of eliminating a substantial amount of subjective determinations that were being made by accountants, we negotiated exactly how the parties agreed to allocate expenses for the business losses. Your whole argument seems to be based on, look, just read the plain literal language of the agreement. It allows for these individual losses. There's this list of exclusions for the individual losses. Owners and officers aren't included in that. So you have this whole stick to the language of the agreement, but it seems to me there's an inconsistency because then you acknowledge that there should at least be this offset for what was covered under the BEL, and so that's why you're just asking for the difference. Aren't you acknowledging there is some double recovery principle that we should read into the agreement even though it's not already there? Then why even do this offset? I mean, if you take your position to the extreme, you would just say they qualify under the plain language, give them all the money they can get under the IEL. Your Honor, I believe the obligation of the claims administrator and the power of the court was to determine under the terms of the settlement agreement what the parties agreed to. What we did in our briefs below, because the rationale that was being promoted to exclude these class members, this is a pure exclusion of a class member, a bar of a claim that's otherwise vested by the agreement. How do you explain the administration of the administrator's decision that they barred your claim initially on the basis, what is it, 306, the plan that prevented double recovery under the IEL and the BEL? And they said you were plainly trying to get the same income, double your income under the plan by using each of the different models. I will answer that in finishing the answers here because it ties together. Oh, I'm sorry. I thought you said. They tie together. We showed at the appellate level and at the district court level in our briefs the fallacy of the assumption that there was a double recovery because policy 363, which changed four times in the course of this class so far and now has been withdrawn, was based on a rationale that implied that because there was a treatment of expenses, there should be an exclusion and a bar that's not contained in the settlement agreement. And what we tried to show and we did show unrebutted is that your presumption that there was double recovery is not factually supported because in this situation when you actually look at the numbers, treating fixed expenses as variable, as a hypothetical, would have changed the business loss by less than $100,000, but the economic loss under Exhibit 8 valued in excess of $700,000 for these three individuals together. So there is a double recovery principle. You're just saying there is no double recovery under these facts given the computations. There is no factual support in this situation to say there's double recovery, but also there's nothing in the settlement agreement that provides a bar for double recovery. And let me explain that because we did address that. He had been asking about this offset point. I'm not sure I ever got the answer to that. We do not believe there is an offset. Okay. All right. I thought you did. I thought at least below, I thought you said there's this $9,000 that did get credited in the BEL, so you'll agree to take that off your new number. At the time we filed our briefs in the appellate level and in the district court level, there was not a clear understanding of whether or not we had a right to appeal to this court. That's been decided by the four decisions. What we did is we, in our briefs, as a belts and suspenders argument, if the panel wanted to go off on some equity thought process, because we weren't sure how they were going to come down, we pointed out that if you believe there should be an offset, the dollars that you offset would be the difference of what the company got. But we do not believe that the agreement creates an offset. Now, on the double recovery . . . You started off saying how you were involved in negotiating this. It's obviously a monster agreement. There's all these parts that interact with each other. If we look at this and say, you know what, it just seems ambiguous whether your clients can also file an individual claim. I mean, obviously, if we think the contract's plain, it's a de novo issue we have to interpret. But if we think it's ambiguous, why shouldn't we defer to the appeals board and the administrator who deal with this whole settlement mechanism on a daily basis and know all the ins and outs about it? We have had over 30 appeal panels hear appeals on this issue of owner-officer exclusion, and there's a split between the panels. So the class members are getting treated based on the luck of the draw of who they draw as an appeal panelist as to whether they say that the agreement allows for an exclusion or they say under the clear terms of the agreement there is no exclusion. There's nothing in the document to support an exclusion. There's nothing in the document to support an offset. Some appeals boards are allowing this? Yes, absolutely. BP appealed from those? Some of them have been BP's appeal. Some have been claimants' appeal. There are appeals pending in front of the district court now on discretionary review that's my understanding have been put on hold awaiting this court. So right now what happens . . . There's all the split in the circuit, so to speak. So to speak. Well, Judge Barbier, he's denied the right for you to appeal from the administrative panelist, right? I mean, he essentially affirmed what has been done by the administrative panelist.  Denied discretionary review. The litigation involved interpretation agreement which this court has determined in the revenue ruling and in the rules ruling and in the Walker Fishing ruling that is appealable to this court on a de novo basis. But you're saying the other cases that present the split, if you will, have been pending this case. So Judge Barbier has appealed on those. Over the course of time at the panel level, there have been multiple different decisions by panelists, some support, some against. Many of those cases were paid and were not appealed by discretionary review. BP paid many of those. I represented some of those. Some are now pending appeal, discretionary review at the district court. We worked our way through the whole process to get here today. Okay. So this case will resolve, I'm calling it a split in the circuits, a split in the appeals panel. This decision . . . But that's your answer to Judge Costa is if we're looking to the appeals panels to help us understand ambiguity, they have created ambiguity themselves. Yes. And in the record, in the supplemental record, we filed an example of four of the appeals panels where they expressly said there's nothing in the settlement agreement that supports this exclusion or this bar for recovery. Is there something new that I don't think you've been asked? And that is, let's suppose, let's put aside completely the owner-officer issue and just imagine these guys were just wage earners and they turned in their claim saying we lost $200,000 and then the company discovered there had been some check that should have been sent to them in 2010 that just was sitting in a drawer. I'm just making up a hypothetical. And they sent them that check for another $50,000 that had nothing to do with the owner's operation, anything like that, but just was a check that was forgotten to be given. Would they have any duty to amend their claim to say, oh, I now got this additional W-2 income that had been forgotten about that was sitting in a drawer? If there had been an anomaly presented in the records, it would have been investigated as for the factual support. No, I'm saying your guy gets, like, he's filed his claim and he's sitting in his office and he gets this lost check in the mail. Does he have an obligation to amend because he's now gotten additional? He filed a valid claim at the time, but now he's gotten this additional money. Does he have any duty to amend? I don't think the agreement creates a duty to amend because the agreement says that once you're paid, that's the end of the discussion, and the release says you cannot come back on changed circumstances. So I believe that is with finality. But one point I wanted to raise or answer your previous question, there are a number of provisions in this settlement agreement where the parties did specifically negotiate for an offset. And where we recognized and where the issue was raised that there could be a double recovery or two claimants seeking the same recovery, we did negotiate and agree to a mathematical calculation that provided an offset. This policy, this decision, this rationale did not provide an offset. And what it really provided is a race to the court, a race to the claim, because if these individuals had filed their individual claim first, they would have been compensated, no question about it. But when the business came in, the business would have been subjected to an offset. But now because the business came first, when these individuals came for their separate independent claim, they were barred from recovery totally. Not given an offset, but totally barred from recovery. And that inconsistency is treating class members differently, impeding class members against class members, which creates a conflict that was not appropriate and has exceeded the authority of the court in interpreting the agreement. And, Your Honor, Judge Costa, we do rely on the terms of the settlement agreement as the binding principle. Thank you. Mr. Rice, Mr. Clark, we'll hear from you. Good morning, Your Honors. May it please the Court, I'm Jeff Clark for BP. Let me try to cut to the heart of this by going to the text of the settlement agreement, and I think, Judge Costa, your questions see this point. We think that this case is controlled by Exhibit 4D. That exhibit has a clear reference to fixed-cost treatment for owner-officer compensation. Mr. Rice tried today at the podium, I don't really think it's in his brief, to argue that the purpose of that fixed-cost treatment is somehow expediency, you know, something like that. There's nothing like that in the text of the agreement. But we submit that the self-evident purpose of Exhibit 4D is to recognize that, yes, it's true, if you are an owner-officer, you can be compensated in two different ways, and that's the purpose of this provision, is to deal with that kind of situation, as opposed to ordinary line employees who only get W-2 wages. You, if you're an insider in a corporation, if you're the owner-officer, you have the ability to make decisions that structure your compensation, either as, you know, wage income or as income that you can get directly through the fact that you're an owner and you have power inside the corporation. Recognizing the fact that you could essentially be looking at, well, what P is the compensation under, or is it under both? There was a treatment decided on and negotiated, and this is in the text of the agreement, it doesn't need any, you know, testimony on a parallel evidence basis at the podium from Mr. Rice, is in Exhibit 4D. And Exhibit 4D says that everyone who got a BEL claim got a bump-up, essentially, for any impacts to owner-officer compensation. So if owner-officer compensation went down as a consequence of this bill, then you would get more compensation on the BEL program. So that means that everybody here, all these three claimants who were all collectively, if you add them all together, 100% owners in this architectural firm, they got complete recovery here. So we think that the exhibit of 4D control... Exhibit 4D's text and its purpose control, you could stop right there. The point of the double recovery argument is that the logic of Exhibit 4D is to avoid double recovery. So whether you bring in double recovery principles as an external basis to help construe an ambiguous agreement, Judge Costa, or whether you just look at it as that's the logic of what Exhibit 4D is doing in the agreement,  Your textual argument about 4D, I mean, I understand it treats officer and owner compensation as a fixed cost, but doesn't the agreement then, it treats regular employee compensation as a variable cost, right? It treats regular, right, as a variable cost. So you don't get a recovery for that under the BEL program. If you're an individual, you know, line employee, so I don't know, take someone like, you know, my dad, right, who was a truck driver. He could come in with his W-2s and say, you know, compensation period compared to the baseline period, and then you would get paid for that difference. But if you're an owner and officer, you're in a special situation. You have this ability to kind of move your compensation rate. I understand the reason for the different treatment, but it does seem to me just listing out in this exhibit where certain costs are going to be allocated in the business calculation, it doesn't expressly say, because of this we're considering as a fixed cost, these people now can't file an IEL claim. I mean, you are asking for us to look at the reasoning and then apply that and infer that would mean they're precluded from filing IELs. And there's this whole list of exclusions for IELs. Obviously, you could have just easily excluded this under the IELs, right? So, Your Honor, two responses to that. First is, any contract, especially one this massive, we would suggest to you, has to be, you know, construed as a whole, right? It has to be construed as a structural matter. And there's also the principle, the same principle applies to statutes, that the specific controls over the general. 8D is the only place where you have a specific indication of how to treat owner-officer compensation. And, you know, might it have been better if that had also been cross-referenced in Exhibit 8A? Maybe so. But, you know, it's clear that that's the only logical purpose of that. And if you were to say that you got 8A compensation, IEL compensation, on top of the BEL compensation, the base BEL compensation, plus the sweetener for owner-officer compensation reductions, you would be rendering that part of Exhibit 8D superfluous. It would entirely be excised from the agreement. It wouldn't serve any purpose except somehow providing extra compensation to owners and officers as compared to line employees. And there's no logic under which that would make any sense. Go ahead. I understand the rationale for your position for owners. But looking at the officer part of it, let's say you have someone who's the chief accounting officer. He has no ownership interest. And under your logic, if the business files a claim, because his compensation's factored into the business calculation, the business gets a recovery, even though, unlike owners, he has no legal claim to the profits of the business, but your argument would shut him out from getting wage income under an individual claim, right? Our argument would shut them out, Your Honor, but I don't think in this case necessarily, if you had concerns about that, that you'd need to go that far. Because in this case, you have three folks who are both officers and owners. And, you know, they all own substantial parts of the... I understand that, but your argument means an officer who has no ownership interest gets no compensation from the plan. I understand the business can pay him, but the business could shut down tomorrow, say, boy, we got this great settlement, BP's paying us so much money, let's shut down, we're not going to give any of it to the chief accounting officer, and he doesn't get a dime, even though for, you know, the year after the BP spill, he wasn't paid anything because there was no income for the company. That's the... I understand that's not this case, but that is a possible result of your argument, right? That is our legal position, but again, it's not presented on these facts, and you could decide the case on narrower grounds. You could decide not to accept the argument  who's in a situation like you're imagining. I would suggest to you that structurally that wouldn't be the right way to interpret the agreement because Mr Rice asserts that if you read the release, somehow the release suggests that it was intended to eliminate all potential squabbles between, you know, any potential, you know, owners, co-owners or co-officers about how awards were to be divided. That's entirely untrue. The claims come in as they're submitted. The claims administrator disposes of them. They go through the... What is... I mean, is it just too simplistic, or has BP given up the idea that there has to be a loss? But, I mean, reading the terms of the agreement, there has to... there has to be an economic loss, as I understand it. Right. Your Honor, I think that... Now, here, have these claimants had an economic loss within that... They have not had an economic loss that has not been more than fully and generously compensated under the settlement agreement. Okay. So, if there is no loss, that ends it, doesn't it? I mean, just as a practical matter, reading the contract as a whole. Yes, Your Honor. If... You know, I think... The way I would put it is like this. There are sort of three arguments. They all relate to each other, and they all reinforce one another. One is the text of Exhibit 4D. Two is the purpose of what Exhibit 4D is doing there, which I think Judge Costa's original questions to Mr Rice were going to. Third is the principle that the whole purpose of the settlement agreement is to comport with economic logic. It's supposed to look at whether you had impacts from the spill, and the way that the parties agreed to deal with that was by Exhibit 4D, sweetening compensation. But doesn't Dixon-Hughes show that they did suffer a loss? Again, loss is defined by comparing pre-spill to post-spill income. Why doesn't the Dixon-Hughes analysis show that even taking your argument, they still have a loss? Okay, so two responses there, Judge Haynes. First, this settlement agreement doesn't provide for the optionality that Mr Rice tried. It's a creative argument, it's a nice try, but Exhibit 4D says that you shall get this fixed-cost treatment which results in sweetening your BEL compensation. It doesn't say you get it at your option. This wasn't a cafeteria settlement. If you look at the text of Exhibit 4D in the note, it says that owner-officer compensation impacts will be treated as fixed costs. They don't say you can choose not to treat them as fixed costs and then go under the IEL program and get paid twice. These guys have always gotten W-2 wages. I mean, this wasn't something hokeyed up for purposes of getting a better settlement or doubly recovering or whatever. This is how they were treated before the spill, before they ever knew there was going to be anything. Then after the spill, before they ever knew there was going to be a settlement, this is how they were treated. And in my head, you haven't shown me that the dollars that they would have made, had there not been a spill, have gone into their pocket already so they don't need this money. Can you show me that? Sure. Your Honor, I think I can show you that like this. The argument is misleading because it imagines if you could show that you were getting less compensation by using the fixed-cost treatment under the BEL program than you would have gotten under the IEL program, if there's any divergence in that, therefore you've shown that you have to be able to get the IEL on top of your BEL plus the sweetener. But that's not the way the settlement agreement is designed. It's designed to provide that you get the BEL base plus the BEL sweetener if there are negative impacts on owner-officer compensation. There's no necessary indication in the settlement agreement that that sweetener has to equal what you would have gotten if you were allowed to file an IEL claim. So they try to make an argument by... That is your double-recovery argument. I mean, otherwise it's not a double recovery. I mean, so that... It's a double recovery, Your Honor. If you're willing to abandon any argument about double recovery, we can skip this line of questioning. But if you're making that argument, it seems to me you haven't shown me, and by your answer, I don't think you can show me, that these guys really have been made whole. They've been made more than whole, Your Honor. Okay, show me that. You just avoided the question. No, I wasn't trying to avoid it. Let me try to explain it like this. Mr. Smith, tell me how Mr. Smith's been made whole. The way the agreement works, Your Honor, is that it has, as a very important feature, an RTP factor, which means that you don't just get your base recovery. You get your base recovery plus a multiplier on top of that. So, for instance, if an RTP were 3, that would mean you would get 4x of any economic losses you provided. They got that incredibly generous treatment under the BEL program, plus they got the sweetener under Exhibit 4D on a dollar-for-dollar basis of any, you know, impact to... negative impact to their compensation. That was the exclusive way that the agreement was designed to compensate them. What they want to do now is come in and say, oh, that's great, you know, I'll pocket that, and the fact that I'm getting, you know, multipliers on any economic losses I had, and I want extra IELTS compensation, too. What I'm trying to say is, Mr. Smith in 2009 had a tax return where he made, let's say, $300,000, and then in 2010 he has a tax return where he makes $200,000. Can you show me that he's received that $100,000? He's received that $100,000 both because... First of all, he's received that $100,000 because that's what Exhibit 4D says, right? It treats it as fixed costs. So that's a given. But has he received it in his pocket? That's what I'm trying to get at. Not in this hypothetical world that you're dealing in, but in his pocket. Right, that's exactly the point, Judge Jolly, is that because he's an insider in the corporation, because he is an owner or an officer, as in this case for all three of the people before you both, they decide how to take it out or not. So the happenstance of whether they decide to leave it in or whether they decide to leave it out, recognizing that that was an economic problem, the agreement that was reached was to deal with it in the text of Exhibit 4D and provide as a one-size-fits-all, not, like, based on your particular facts, really, except, you know, whatever your dollar loss was, that you would get that amount of money built into the BEL award in the corporation that you own or are an officer in. That was the treatment... I'm not understanding how it theoretically works. So then... But I'm not... It's not clear to me how they then come up with this calculation for their offset, because wouldn't the offset completely wipe away the wage income if the BEL included the full wage income? The wage... All right, so... Do you agree with their calculations, at least? No, because one of the whole questions is how the RTP applies to those calculations or not, right, which might help to bring the numbers more in alignment. Let me try this to help you to understand it. It's really circular. I mean, what they're doing is they're saying, you know, OK, yeah, there was an accounting for in Exhibit 4D for officer-owner compensation reductions. Let's say that $100,000 from Judge Haynes, for example. Yeah. Let's say $100,000. $100,000 in lost income was given as a fixed cost. The business essentially got that. Right. So now they're saying, ignore all that. Now I just want to do a calculation based on what happened in my W-2s, which is an entirely separate calculation, and then pay me under the IEL. And if... OK, so what they're comparing are two things. What happens for BEL compensation if they voluntarily give up the favourable fixed-cost treatment? Versus what I get if I get base BEL compensation plus IEL compensation together. And they subtract the two numbers, and that's what they say the impact is. And what we submit is that's not a methodology that's permitted under the settlement. The settlement agreement doesn't say you can choose between base BEL plus IEL or, you know, BEL plus the sweetener, full stop. I think that's helpful. So when they're saying there's all this... I think for one of the guys there's a $9,000 offset, that's just for the sweetener? Yes. They're not denying that the full $100,000 from our example was included. Was... led to that $9,000. They're saying, we'll give up... We'll give up the fixed treatment cost, and we'll accept the variable treatment cost. And if we do that, here's the number we come up with, we'll voluntarily deduct that from what we would recover if you also let us get IEL-2. That's what they're doing. But the $100,000 was paid to the business, and now they're wanting it paid to... Now they want to get paid twice. Yeah. So, you know, that's... that's the reason why the numbers don't match up. The numbers don't match up because they're creating an option under the settlement agreement that they weren't given. Did I understand correctly that historically they were paid W-2 wages? Is that correct? That's my understanding, yes, Your Honor. And that they intentionally and deliberately and knowingly forewent a payment by W-2 wages? They offered to sort of do the functional equivalent of that to the settlement program, and it was rebuffed at every level. They offered to do it. They didn't actually do it. Okay, but that's what they proposed to do. So, like I said, then we have recovered no wages. We have a complete loss of income from the W-2 wages that we've been paid in the past. Right. Even though they have been paid the money that ordinarily would have gone to pay the W-2 wages that these claimants would have received. Right, because if you're a owner or officer, your W-2 income is treated, you know, with a special rule. There's a special rule in Exhibit 4D. And, you know, to say it in its most simple terms, you know, that special rule would be eviscerated if you allow them to also recover IEL. And let me tie that, if I could, to the whole waiver issue. Mr. Rice fully recognized that the settlement agreement, that the claims administrator understood, and most of the claims panelists, the appeals panelists, understood how the settlement agreement was intended to work. And so that's why when he went to Judge Barbier to ask Judge Barbier to, you know, reverse what had happened below, they made this offer of, okay, you know, functionally, we're not really challenging that, you know, the whole issue of, like, we want full IEL together with the sweetener. We'll offer to give up the BEL sweetener, as a matter of fact. And on that basis, you know, please let us do that. At least, you know, they could recover, you know, a large portion of what they would get under IEL. That is the only argument that they made to District Judge Barbier. And we would suggest to you that that's... They're sandbagging by now coming to the court and saying... They didn't argue that the settlement agreement allows them to get IEL? No, Your Honour. If you look at... I have the... Mr Fleischman's is an example, if you take a look at it. You'll see... Oh, this is on the form that they have a limited number of pages to file? Yes, that's correct. But if you look at it, they only make one argument. They have a Roman I, and then they have an A under it. They don't have a B. It would have been very easy for them to make a B argument that said, hey, we want full IEL, too. I think that's wrong for all the reasons I've been saying. But just to point out to you where the waiver issue comes in, the only argument that they made, and this is at 8759 of the 14-31402 case, is double recovery is not presented by compensating the instant claim. Right? The argument that... They did argue that the appeals panel failed to comply with the settlement agreement as there is no authority to support denial of their claim, and nothing in the settlement agreement categorically bars IEL claims by owner's officers when owner's officer's compensation is designated as a fixed expense in the BEL award calculation. Is that the argument they're making here? No, Your Honor. That's not a plain reading of the statement. If you read... I submit to you, if you look carefully at that 3-page brief that they filed, what they were telling Judge Barbier is, it may be that other folks... It may be that if we didn't offer to kind of return this BEL sweetener, that there would be double recovery on the fax, but because we're offering to return it, therefore there's no double recovery on this fax, and therefore... Well, I mean, they're expressly saying that the IEL claims are not barred by the BEL claims, and that's the argument they're making here. They make it more fulsomely here because they have more than 3 pages. Your Honor, I don't think that they really make that argument in anything more than a kind of hint-like fashion here. That's... It's in the eye of the beholder. Okay. So, you know, let me put aside the waiver argument. I think that the waiver argument shows that they put all their eggs at the Judge Barbier... They made the argument at the CSSP level and at the appeals panel level. The full... Romans 1 through 5 of Mr Rice's brief are in that briefing. But to Judge Barbier, they put all their eggs in the basket of there's no double recovery on the fax here by trying to offer to return the sweetener. That's really the only argument they preserved, and I suggest to you it's really easy to say that that argument should be rejected because that optionality of making that choice between, well, we'll take BEL plus the sweetener or BEL base without the sweetener plus IEL, that wasn't given to them in the settlement agreement. So, you know, it's a nice try. It's a creative attempt to try to get around the fact that the text of the settlement agreement explicitly tells you how to deal with issues where there are negative impacts on owner-officer compensation, but I think ultimately it fails for the reasons I was saying. Okay, so your rule, if we're trying to create... to resolve this split among the appeals panel, your rule is if somebody's an owner-officer, regardless of whether they were paid on a W-2 basis, W-2 basis pre-spill, they can only recover through a BEL claim and they cannot file an IEL claim. That's correct, and they recover a BEL claim that gives them this extra, you know, bump-up. If there were any negative impacts to their W-2 compensation as a result of the spill, or really chronologically, given the way the settlement agreement works after the spill, then they recover that by increased BEL compensation. If they filed for an IEL first, they could have gotten it. So, Your Honor, on that, that's one of the extents to which BP disagrees with the policy that was in effect. So we think that what the settlement program should have said is, you know, if you have owners and officers, you're just coming in to make a BEL claim. That's the only claim you're going to get. It shouldn't matter on the sequence of whether an IEL claim or BEL claim gets filed first, but, you know, the policies that the claims administrator adopts aren't binding on appeals panelists, they're not binding on Judge Barbier, and they're not binding on you. Let me ask you, forget about a timing issue. Let's say the three owners in this case said, you know what, let's forego the BEL, let's all go as individuals. There's never going to be BEL. Would that be allowed? So our position would be that, given Exhibit 4D, the right answer to tell them would be, you can't recover under the IEL program, given Exhibit 4D. You can't go file a BEL claim and then we'll pay you. That's what we think. What the policy said was that it depends on the sequence. So if you came in on your hypothetical, Judge Costa, and the three owners said, hey, just pay us on the IEL claim, then they would get paid on the IEL claim. No one would rationally do that because that amount of compensation is less than the BEL, but that's... Yeah. I'm just thinking through the economic impact of your position. I mean, a high-paid executive who is a very small owner is going to be, I don't want to say mistreated, but undercompensated. You own only 1% of the company, but you're the CEO, and you're making a million bucks a year. You only have a 1% claim to whatever the BEL was, but you're not going to get your $1 million in lost salary, right? And, Your Honor, that's... There are going to be winners and losers under everything. I get that. Yeah, there are going to be winners and losers. And the point, you know, the extent to which I agree with Mr. Rice is that a one-size-all fits treatment was decided on, right? It could have created a facts and circumstances kind of a standard that said, you know, maybe even ask the claims administrator to decide whether on the facts, you know, how should it be allocated between fixed costs and variable costs. But instead, the agreement just decided, in this sort of situation, it's going to be treated as fixed costs. That's really undisputed with Mr. Rice. And then, as a result of that, you get more BEL compensation. And so, you know, the individual facts and all the parade of horribles Mr. Rice gives you about how, you know, particular people, if you have, you know, a situation where two owners gang up on one owner, first of all, it's not presented by the facts of the case in front of you. You have three unified owners. Mr. Rice couldn't be representing all three of them if they were squabbling about, you know, what their right allocation was. The settlement agreement just decided, you know, and it makes a lot of efficient sense to just have one rule. That rule says you get the extra BEL compensation, and you're done with it. It makes it also easier for the claims administrator to administer. Okay, Mr. Clark. Thank you very much, Mr. Rice. You have some time for rebuttal. I'll try to take the issues in the order they were presented. The question related to the release, when we discussed the release, was the question of whether the claimant that got a check that came out of the drawer would come back in. And the reference to Exhibit 26 of the release says, the court may make decisions, the case is not final, there may be changes, but if you sign the release, you're done. And that was the reference to the release. And the question really was before you get any money. So in other words, if you file your claim, but before you get money, you suddenly come into realization that your claim is now inaccurate. Do you have a duty to amend? And you said no. No, I don't think so. The question on the loss that's been asked, in the record, taking just the Kevin Smith case, in the record at 9086, is the accountant's calculations of the loss. And if you review that, you'll see that in the pre-spill period, this individual was making $5,000 or $6,000 a month. He also got, during the year, bumps, which were distributions or commissions. Whereas in 2010, his salary was like $2,000 a month, and there was no additional payments. That's the basis that the settlement agreement calls for you to determine whether or not he has an economic loss. I mean, the argument that's been made is he's an owner, and if the company got a big blob of money, why didn't he march in and get his ownership share of that and get compensated that way, and that would net out for the $3,000 a month. There's nothing in this record about what the company got whatsoever. But hypothetically, if the company had a loss profit, yes, they were entitled to recover that, and that was what was negotiated. And all this discussion about fixed expenses, the record is perfectly clear, and three experts testified in the fairness hearing. And Mr. Henley, BP's expert at Record 4881, said that Mr. Henley's declaration addressing expenses stated that many categories of business expenses have both a fixed and variable element, and it is reasonable for ease of administration and for consistency of treatment to categorize expenses as fixed or variable. The classifications were sensible and often generous. And BP argued all through the approval process how generous the process was. But if they had wanted to address this question of double recovery, if they wanted to address this question of exclusion, we could have talked about when do you determine whether you're an owner-officer? Is it 2007, 2008, 2009? Is it pre-spill? Is it post-spill? There's nothing in this agreement that gives you any guidance. I could be an officer in 2012 when I made a claim. I'd be barred. But it had nothing to do with the compensable period of time that's at issue here. There's nothing in here that talks about when you're an owner-officer and when you determine that factual scenario because that could change over time. We could have addressed those issues. What was the relevance of the Dixon-Hughes analysis to all of this? The relevance of the Dixon-Hughes analysis was there was an implied exclusion of a class member from the right to recover under the IEL on the presumption that they had been previously paid under the business laws because fixed expenses included owners' and officers' compensation. So what we did is to show the fallacy of the rationale behind the implication. So it was a belt and suspenders to say, forget about the agreement doesn't allow any of this. Factually, it's just not supported. And the question about waiver, if the court will look at the record in the discretionary review briefs, we argued in all three briefs the class member suffered a loss. It was improvidently denied by the claims instructors or claims administration's interpretation of dual recovery. They failed to comply with the settlement agreement. There's no authority to exclude owners and officers. Nothing in the settlement agreement categorically bars them. We consistently raised this. We were limited to three pages double-spaced is our limitation in that time. But also we have filed in the record the appeal panelist briefs, which were longer, which we consistently raised the same issue throughout. He said he rises or falls on 4D essentially. 4D is a negotiation of how a business recovers its variable profit that developed a method of eliminating the subjectivity of going back in every case and arguing how to treat one expense or another. And there were tradeoffs where some expenses that could partially be variable and partially be fixed, we said we'll treat them as variable. And some that could be partially the other way, we'll treat them as fixed. And the parties spent months negotiating specifically how to treat them, not once. In any of this 6,000-page record is this issue raised before class certification that because fixed expenses include owners and officers, includes fixed expenses, that has an implication on a separate class member's claim. In fact, Judge Barbier, in his final decision, made it perfectly clear, and he said the claims frameworks offering generally uncapped compensation ensure that a benefit paid to one member of the class will in no way reduce or interfere with a benefit obtained by another class member. What's the record site for that? The record site for that is the final decision of the court. I don't have it. 6053 is the record number. Okay, Mr. Rice, I believe you have a red light. Thank you, Your Honor. Thank you. That completes the arguments we have on the oral argument calendar.